Field 2/14/25  P. v. Stiles CA2/6
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>CHELSEA STILES,<br><br>  Defendant and Appellant. | 2d Crim. No. B311291<br>(Super. Ct. No. 19F-09422)<br>(San Luis Obispo County)<br><br>OPINION FOLLOWING ORDER<br>VACATING PRIOR OPINION |

Chelsea Stiles appeals a judgment following conviction of gross vehicular manslaughter while intoxicated; assault with a deadly weapon (four counts); leaving the scene of a vehicle collision; child abuse with personal use of a deadly weapon (motor vehicle); and possession of a controlled substance.  (Pen. Code,[1] §§ 191.5, subd. (a), 245, subd. (a)(1), 273a, subd. (a), 12022, subd. (b)(1); Veh. Code, § 20001, subd. (a); Health & Saf. Code, § 11350, subd. (a).)

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

This appeal concerns Stiles's traffic collisions with two vehicles in the early evening of December 1, 2019. Stiles rammed into the back of a vehicle containing four members of the DiCarlo family, disabling their vehicle, and forcing them from the roadway. Seconds later, Stiles drove into the opposing traffic lane at high speed and collided with a vehicle driven by Terry Tilton. That collision resulted in a "fireball" explosion, killing Tilton immediately. Following the collision, laboratory testing of Stile's blood revealed the presence of cocaine and marijuana. On appeal, Stiles challenged the trial court's failure to direct an immediate readback of a defense expert's testimony, the admission into evidence of her statements made at the scene and hospital to a police officer, and the application of Senate Bill No. 567 to her aggravated sentence. We rejected these contentions and, in an unpublished opinion, affirmed. (*People v. Stiles* (July 29, 2022, B311291).)

Our Supreme Court then granted review of that decision and transferred the matter to this court with directions to vacate our decision and reconsider the matter in light of *People v. Lynch* (2024) 16 Cal.5th 730 (*Lynch*). We have reconsidered the matter after receiving supplemental briefs from the parties. We conclude beyond a reasonable doubt that a jury would have found beyond a reasonable doubt all of the aggravating factors upon which the trial court relied to impose the upper term sentence in this case. (*Lynch,* at pp. 742-743.) Accordingly, we affirm.

*FACTUAL AND PROCEDURAL HISTORY*

Stiles and Daniel Shaffer had an intimate relationship and, in 2018, had a daughter H. In early 2019, Stiles and H. lived with Shaffer, his father, and Stiles's older daughter S. in Arroyo

Grande.  Stiles and Shaffer used cocaine frequently but spoke of limiting or ending their use.

In June 2019, Stiles and Shaffer argued, and Stiles and H. moved into her parents' home.  In November 2019, Stiles and H. moved to Bakersfield.

On November 30, 2019, Stiles brought H. to Arroyo Grande to visit Shaffer.  At the Shaffer residence, Stiles entered the home and retrieved belongings.  She then sat outside on the sidewalk curb and spoke on her telephone; she also stared angrily at Shaffer, cursed, and appeared "demonic."  Stiles then entered the residence and took H.  She claimed that the family had placed a curse on her (Stiles).  As Stiles left, Shaffer warned her that she needed to control her anger and that she had a drug problem.  Stiles and Shaffer soon exchanged text messages in which Stiles made nonsensical, angry, and strange statements.  Shaffer became concerned about Stiles's mental health and her use of drugs.

Around 6:00 p.m. that evening, Joan Schilling drove along Noyes Road in Arroyo Grande when she noticed Stiles parked on the side of the road.  As she passed Stiles's sports utility vehicle, Stiles followed her into her neighborhood and blocked Schilling's security gate.  Schilling went inside her residence and informed her husband, who then went outside and saw Stiles parked at the second security gate to the property.  Stiles then drove away and Mr. Schilling followed and telephoned the police emergency dispatcher.  He continued to follow Stiles's vehicle as she twice collided with the DiCarlo vehicle ahead of her and then braked.

*Collision with the DiCarlo Vehicle*

Germano DiCarlo, his wife Jacilyn, and their two children were in their family vehicle driving to the San Luis Obispo

airport. Stiles drove her vehicle at high speed behind them, flashing her headlights. DiCarlo had no roadside shoulder on which to stop and he continued to drive the speed limit. Stiles then "slammed" into the back of the DiCarlo vehicle twice. The second collision disabled the vehicle and DiCarlo drove to the side of the road. Jacilyn telephoned the police emergency dispatcher and reported the incident.

*Collision with Tilton Vehicle*

As Mr. Schilling was speaking to the police dispatcher, Stiles drove into the opposing lane and struck a pickup truck driven by Terry Tilton. The truck exploded and Tilton died immediately from blunt force trauma. Schilling informed the dispatcher that Stiles "swerved right into" Tilton's vehicle.

*Aftermath of Collisions*

At the scene, Stiles spoke with Samaritan motorists, Jacilyn DiCarlo, first responders, and California Highway Patrol (CHP) Officer Trevor Ashby. Jacilyn DiCarlo questioned Stiles as to why she slammed into their vehicle. Stiles stated that she did it on purpose but did not know why. Stiles spoke in a normal tone of voice but appeared disconnected.

Stiles informed responding paramedics that she was in pain, but they did not see any visible injuries. A paramedic believed that she was in a manic state; her statements did not suggest a head injury. Stiles gave her birth year as the current year and stated that H. was not her child. She also stated that she had consumed alcohol and cocaine prior to driving and that she wanted to die.

Officer Ashby responded to the incident and spoke with Stiles in the ambulance. Stiles stated that she had consumed rum but Ashby did not detect any alcohol odor. At the hospital,

4

Stiles informed Ashby that she had used cocaine several hours earlier. She also admitted that she had caused the collision on purpose and wanted to kill herself. Stiles did not respond to some of Ashby's questions, and to other questions, her responses were unintelligible.

On December 2, 2019, Kyle Webb, a social worker with Child Welfare Services, interviewed Stiles. Among other statements, Stiles admitted driving too fast and causing the Tilton collision. She also stated that she had "more than enough time to get out of the way," but "just didn't."

Crime investigators found Stiles's purse inside her vehicle. It contained her passport, a baggie containing 0.25 grams of cocaine, and a straw-like object containing white powdery residue. Testing of Stiles's blood at the hospital revealed cocaine, cocaine byproduct, and marijuana. The estimated time of ingestion of the cocaine was within 10 hours of the collisions.

Members of an accident reconstruction investigation team testified regarding their findings and conclusions. CHP Officer Alex Banks concluded that the skid marks on the roadway from Stiles's vehicle occurred after the collision with Tilton. He opined that Stiles's vehicle may have been steered to the left toward oncoming traffic. CHP employee Larry Iunker examined Stiles's vehicle and concluded that it was well maintained, recently serviced, and had no mechanical issues. CHP Officer Scott Peterson examined the data retrieval systems in Stiles's vehicle and concluded that she was traveling at full throttle at 73 miles per hour when she collided with the DiCarlo vehicle. Peterson also concluded that Tilton applied emergency braking at least three seconds before the collision.

5

*Defense Evidence*

Stiles testified that she was overwhelmed by the stress of Shaffer's abusive behavior and consequently moved to Bakersfield. She stated that on the night of the collisions, she used only one line of cocaine which made her more alert. Stiles testified that she recalled hitting her head on the steering wheel during the two collisions with the DiCarlo vehicle, but that she had no memory of the Tilton collision. Stiles also offered unusual explanations of her strange communications to Shaffer and family members as well as her suspicions regarding others.

Doctor Catherine Ward, a neuropsychologist, reviewed Stiles's medical records and interviewed Stiles and her family members. Ward opined that Stiles was experiencing bipolar disorder with psychotic and anxiety features before, at the time of, and following the collisions. Ward stated that Stiles's odd behavior, nonsensical responses to investigators and first responders, and her strange text messages were symptoms of erratic and paranoid thinking. Ward also opined that Stiles suffered from a diffuse mild or moderate brain injury following the collisions that affected the reliability of her statements.

*Conviction, Sentencing, and Appeal*

With the exception of a murder charge on which jurors could not agree, the jury convicted Stiles of all charges.[2] The trial court dismissed the murder charge on the prosecutor's motion and on its own motion dismissed the lesser offense charge of driving under the influence causing injury. (§ 187, subd. (a) (count 1); Veh. Code, § 23153, subd. (f) (count 3).) The court sentenced Stiles to 15 years 8 months imprisonment, consisting

---

[2] The jury was divided 11 to 1 in favor of a conviction of second degree murder.

6

in part of an upper term of 10 years for gross vehicular manslaughter. The court imposed various fines and fees and awarded Stiles 550 days of presentence custody credits.

Stiles appeals and contends that the trial court erred by: 1) not timely responding to the jury request for a readback of the defense neuropsychologist's testimony; 2) admitting evidence of her involuntary statements made at the scene and hospital; and 3) imposing an upper term sentence without considering mitigating factors or recent ameliorative legislation. She also asserts that cumulative error denied her a fair trial.

*DISCUSSION*

I.

Stiles argues that the trial court failed to promptly notify counsel and improperly responded to the jury's request for a timely readback of Ward's testimony. She contends that the error violated section 1138 and her federal and state constitutional rights to due process of law and a fair trial. Stiles points to the importance of Ward as a critical witness and asserts that the error was prejudicial.

Prior to deliberations, the trial court instructed that the jury could request a readback of testimony or stipulations. (CALCRIM No. 202.) At 9:58 a.m. on December 7, 2020, the second day of deliberations, the jury submitted a request for a readback of Ward's testimony. A few minutes later, the jury recessed at 10:05 a.m. and the bailiff informed the court that a juror was ill. The court instructed the bailiff to send the ill juror home. The court then held a hearing and the parties agreed to send the remaining jurors home. It was then 10:45 a.m., about 45 minutes following the jury's written readback request.

7

Jury deliberations resumed the following day, December 8, 2020, but no readback of Ward's lengthy testimony was given. The court clerk asked the bailiff to ask the jury whether it was requesting a full readback or a partial readback of Ward's testimony. The jury never responded.

On December 9, 2020, the fourth day of deliberations, the trial court realized that defense counsel was unaware of the jury's note regarding the Ward testimony readback. The court apologized to counsel and stated that the entire testimony of Ward would be read.[3] The court's note to the jury stated: "The testimony of Dr. Ward will be read to you shortly." Approximately 20 minutes later, the court reporter entered the jury room to read Ward's testimony. She left the room at the jury's request when a juror asked if he could ask her a question. She replied no and stated that any question must be in writing to the court. A few minutes later, the jury sent a note to the court stating that it "no longer need[ed]" the readback.

Stiles then moved for a mistrial, arguing that the two-day delay in responding to the jury's request for readback violated section 1138 and her constitutional rights to due process of law and a fair trial. The trial court denied the motion but acknowledged that it erred by not notifying counsel of the readback request made two days earlier. The court then suggested, and defense counsel agreed, that the court would

---

[3] This response occurred approximately one day after the jury returned to court following a juror's illness. The court recessed the morning of December 7, 2020, due to illness; on December 8, 2020, there was a readback of Stiles's testimony but not that of Ward. The following day, December 9, 2020, the court sent the court reporter into the jury room to read back Ward's testimony, but the jury dismissed her.

inform the jury that Ward's testimony or that of any other witness was available for readback at any time. The court then did so in writing. Later that day, after six hours of deliberation, the jury reached its verdicts except for count 1, murder, upon which it was unable to reach a unanimous verdict.

Section 1138 provides: "After the jury have retired for deliberations, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

The trial court did not abridge Stiles's statutory or constitutional rights by not immediately informing counsel and responding to the jury's note. Although the preferable practice is to notify counsel of all mid-deliberation inquiries, a statutory or constitutional violation occurs only where the court provides the jury with instructions or evidence during deliberations without first consulting counsel. (*People v. Mickle* (1991) 54 Cal.3d 140, 174 [during deliberations, jury requested definition of first and second degree murder; trial court responded without notifying counsel that it would reread instructions if jury wished to return to court].) Here, as in *Mickle*, the jury never responded to the court's offer to reread instructions or testimony. (*Ibid.* ["We can only assume that the jury, upon reflection, was satisfied" with the information already provided].)

Although the jury twice requested readbacks of Stiles's testimony, it did not accept the trial court's offer to read back Ward's testimony. The court never indicated it would not provide

a readback and the bailiff merely asked the jury to clarify whether it was requesting all or a portion of Ward's testimony. Stiles's claim that the court's request for clarification was a rejection of the jury's readback request is "speculative and implausible." (*People v. Mickle*, *supra*, 54 Cal.3d at p. 174.)

II.

Stiles contends that the trial court prejudicially erred by admitting evidence of her statements made to Ashby in the ambulance and at the hospital because the statements were involuntary. (*Mincey v. Arizona* (1978) 437 U.S. 385, 396-402 [accused was medicated, in intensive care due to gunshot wound, and lapsing in and out of consciousness; hours long police interview found involuntary].) She points out that she was isolated in the hospital, was in pain without pain medication, had a fractured foot, and likely had a brain injury. (*People v. Caro* (2019) 7 Cal.5th 463, 526-535 (conc. opn. of Lui, J.) [confession found involuntary under similar circumstances].) Stiles asserts that the error violates her federal and state constitutional rights against self-incrimination and to due process of law.

Ashby spoke with Stiles in the ambulance at the scene of the Tilton collision and at the hospital. In the ambulance, in response to Ashby's questions, Stiles stated that she had been driving, had consumed a fifth of rum, and had used cocaine. Ashby did not detect any odor of alcohol on Stiles and her vehicle contained an unopened bottle of rum.

At the hospital, Ashby continued to question Stiles for about 15 to 20 minutes. Stiles stated that she had consumed rum, used cocaine about two hours before the collision, and crashed on purpose. To other questions, Stiles's answers were nonsensical or nonresponsive. Stiles received pain medication

10

nearly four hours after arriving at the hospital. After Ashby arrested Stiles and left her hospital room, another officer advised Stiles of her *Miranda* rights. (*Miranda v. Arizona* (1966) 384 U.S. 436.) That officer and a second officer then questioned Stiles. The trial court later found that Stiles's statements to these two police officers were involuntary.

We need not decide whether Stiles's statements to Ashby were involuntary. Error, if any, in admitting Stiles's statements to Ashby is harmless beyond a reasonable doubt. (*People v. Caro, supra*, 7 Cal.5th at p. 493 [standard of review].) Stiles made similar statements to others indicating that her actions were intentional. To motorist Amanda Bassett, who stopped to help Stiles following the collision, Stiles stated that only she and H. were in the vehicle. When Jacilyn DiCarlo asked Stiles if she struck their vehicle on purpose, Stiles replied that she did but did not know why. Stiles informed a paramedic that she wanted to die. She also admitted to a social worker that she struck Tilton's truck in the opposing lane although she had time to move back to her lane but did not do so. She indicated that she drove fast because she was upset and that the collision was her fault. Mr. Schilling saw the head-on collision, police officers found cocaine in Stiles's purse, and her blood contained the presence of cocaine and marijuana. Stiles also informed a hospital nurse that she had used cocaine recently. We are persuaded beyond a reasonable doubt that the jury would not have reached a different result had the trial court excluded the statements Stiles made to Ashby. (*Id.* at p. 495.)

### III.

Stiles argues that the trial court abused its discretion by imposing the upper term of imprisonment for count 2 (gross

11

vehicular manslaughter) because it relied on invalid aggravating factors and ignored mitigating factors of her psychotic mental condition, anxiety, and stressful relationship with Shaffer. She adds that the recent enactment of Senate Bill No. 567 (2021-2022 Reg. Sess.) requires a remand for resentencing pursuant to section 1170, subdivision (b), as amended, because the jury would not have found every aggravating factor true beyond a reasonable doubt. Stiles describes her crime as an ordinary vehicular manslaughter.

In imposing the upper term, the trial court relied upon the following aggravating factors: 1) the crime involved great violence; 2) the victim was particularly vulnerable; 3) Stiles was convicted of other crimes for which consecutive sentences could have been imposed but received a concurrent sentence; and 4) Stiles's violent conduct presents a serious danger to society. (Cal. Rules of Court, rule 4.421(a) & (b).) In sentencing Stiles, the trial court commented that Stiles does not appreciate the devastating consequences of her actions and decisions on December 1, 2019. The court declined to consider Stiles's mental condition or stressful relationship with Shaffer as mitigating factors.

Senate Bill No. 567, which became effective January 1, 2022, amended section 1170 by making the middle sentencing term the presumptive sentence unless certain circumstances exist. (Stats. 2021, ch. 731, § 1.3, adding § 1170, subd. (b)(1), (2).) Pursuant to the amendment, the trial court may impose an upper term sentence only where there are circumstances in aggravation and the facts underlying those circumstances have been stipulated by the defendant or found true beyond a reasonable doubt by a jury or court trial. The Attorney General concedes that Senate Bill No. 567 applies retroactively to Stiles.

12

*Lynch* held that where a trial court relied upon facts not proved in compliance with section 1170, subdivision (b) to impose the upper term, the sentence must be vacated and the matter remanded unless we conclude beyond a reasonable doubt that the jury would necessarily have found the facts underlying all circumstances in aggravation relied upon by the court true beyond a reasonable doubt. (*Lynch, supra,* 16 Cal.5th at pp. 742-743, 761.) In making this determination, we examine what the jury necessarily did find and ask whether it would be impossible on the evidence for the jury to find that without also finding the missing fact as well. (*Id.,* at p. 775.) Further, because Senate Bill No. 567 altered the scope of the trial court's discretion regarding sentences imposed pursuant to former 1170, subdivision (b), the record must "clearly indicate" that the court would have found an upper term justified had it been aware of its more limited discretion. (*Lynch,* at p. 743.)

Any fact-finding error here is harmless beyond a reasonable doubt because the jury would have found *every* aggravating sentencing factor true beyond a reasonable doubt. Stiles's crime involved great violence. She drove her 5,000-pound vehicle into oncoming traffic at high speed and caused a "fireball" collision, killing Tilton immediately. (Cal. Rules of Court, rule 4.421(a)(1).) Tilton was also particularly vulnerable. He had only seconds to avoid Stiles and had no means to avoid her high speed collision with him. (*Id.*, rule 4.421(a)(3); *People v. Weaver* (2007) 149 Cal.App.4th 1301, 1316 [head-on, high speed collision at night; disagreeing with earlier decisions concluding victims of vehicular manslaughter not particularly vulnerable], overruled on other grounds by *People v. Cook* (2015) 60 Cal.4th 922.) Stiles's conduct in using her vehicle as a deadly weapon against the

13

DiCarlo family and Tilton also presents a serious danger to society. Stiles drove the DiCarlo vehicle off the road following two collisions with their vehicle, causing the vehicle to be disabled and the family to be terrified. Within seconds, Stiles drove at Tilton's vehicle at high speed causing a fireball collision and his immediate death. Stiles admitted the collisions but stated she did not know why she intentionally caused them. (Cal. Rules of Court, rule 4.421(b)(1).) Finally, the trial court imposed a concurrent instead of consecutive sentence on count 8, leaving the scene of a vehicle collision. (*Id.*, rule 4.421(a)(7).)

The jury convicted Stiles of gross vehicular manslaughter while intoxicated, necessarily rejecting her defenses of accident or unconsciousness due to head trauma or mental illness. It would be impossible for the jury to make these findings and not also find the circumstances of the crime were not aggravated in the four ways relied upon by the trial court.

Moreover, the trial court "clearly indicate[d]" that it would not have imposed a lesser sentence. (*Lynch, supra,* 16 Cal.5th at p. 743.) The court rejected Stiles's claims of mental health issues or a stressful relationship with Shaffer as mitigating sentencing factors. The court stated that it was troubled that Stiles did not grasp the devastating consequences of her behavior and the trauma caused to the DiCarlo family and Tilton. Thus, remand for resentencing is unnecessary.

*DISPOSITION*

The judgment is affirmed.

<u>NOT TO BE PUBLISHED.</u>


GILBERT, P. J.


We concur:



YEGAN, J.



BALTODANO, J.

Jacquelyn H. Duffy, Judge

Superior Court County of San Luis Obispo

_____

Richard B. Lennon, under appointment by the Court of Appeal; Mark R. Feeser, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, William H. Shin, Idan Ivri and Yun K. Lee, Deputy Attorneys General, for Plaintiff and Respondent.